# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

JEFFREY LA BRI,

                 Plaintiff,

v.

MICHAEL FINN, JENNIFER VAN KIRK, MARK SANDERS, SHERYL DOLEZAL, EPHRAIM FRANKEL, and ALAN JAFFE,

                 Defendants.

Case No. 18-CV-2012-JPS

**ORDER**

      This case arises from an acrimonious divorce proceeding between Plaintiff Jeffrey La Bri and his ex-wife, Angela Strunsee ("Strunsee"). On January 3, 2019, Plaintiff filed an amended complaint alleging violations of 42 U.S.C. § 1983, 18 U.S.C. §§ 1961-1968, and Wisconsin medical malpractice and child abuse statutes, all of which were purportedly committed by various actors involved in his divorce. (Docket #2). Defendants consist of Jennifer Van Kirk ("Van Kirk") and Mark Sanders ("Sanders"), Plaintiff's former attorneys in the divorce proceedings; Ephraim Frankel ("Frankel"), Alan Jaffe ("Jaffe"), and Sheryl Dolezal ("Dolezal"), mental health professionals that were involved in the divorce proceedings; and Michael Finn ("Finn"), the court-appointed guardian *ad litem* ("GAL") to Plaintiff's son, Christian. Defendants filed various motions to dismiss for want of jurisdiction under the *Rooker-Feldman* doctrine, immunity, and failure to state a claim. (Docket #8, #15, #19, #37, and #50). Finn also filed a motion to stay discovery pending the resolution of the motions to dismiss. (Docket #21). On March 15, 2019, Plaintiff filed a motion for leave to supplement

pleadings and to add a new defendant, (Docket #55), which Defendants opposed on futility grounds, (Docket #59). The motions to dismiss are now fully briefed, and for the reasons explained below, will be granted. For similar reasons, Plaintiff's motion for leave to supplement the pleadings and to add a new defendant will be denied.

1. **LEGAL STANDARD**

Federal Rule of Civil Procedure 12(b) provides for dismissal of complaints which, among other things, fail to state a viable claim for relief. Fed. R. Civ. P. 12(b)(6). To state a claim, a complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). In other words, the complaint must give "fair notice of what the. . .claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The allegations must "plausibly suggest that the plaintiff has a right to relief, raising that possibility above a speculative level[.]" *Kubiak v. City of Chicago*, 810 F.3d 476, 480 (7th Cir. 2016) (citation omitted). In reviewing the complaint, the Court is required to "accept as true all of the well-pleaded facts in the complaint and draw all reasonable inferences in favor of the plaintiff." *Id.* at 480–81. The Court is obliged to give a *pro se* plaintiff's allegations, "however inartfully pleaded," a liberal construction. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007).

2. **RELEVANT ALLEGATIONS**

The following facts are gleaned from the amended complaint. Plaintiff and his ex-wife, Strunsee, live next door to each other and share custody over their teenage son, Christian. The custody arrangement was without incident until around 2015, when Christian and his mother began to fight. One night, in November 2015, Christian presented himself to Plaintiff's house with a scratch on his arm, and claimed that Strunsee had

attempted to remove him from her vehicle and leave him by the side of the road. Plaintiff took a photograph of the scratch and called his attorney. His call resulted in a court hearing before Judge Michael Bohren, in Waukesha County Circuit Court, who appointed a GAL, Finn, and temporarily ordered full custody to Plaintiff. Judge Bohren left the decision for future custodial placement to Finn. Throughout these initial proceedings, Christian stayed with Plaintiff. Plaintiff was committed to reuniting his son with Strunsee and helping them move past the conflict.

Finn met with Plaintiff, Strunsee, and Christian in late 2015 in order to evaluate the situation. After interviewing the parties and reading a letter that Plaintiff helped Christian write, Finn determined that Christian should see a therapist, Frankel, and that his mother should drive him to therapy. Finn suspected that Plaintiff had coached Christian to say negative things about Strunsee, and put little stock in Christian's fears of driving with her.

Plaintiff did not find this result satisfactory, and reached out to Strunsee, Finn, and Frankel in an attempt to change Finn's decision about who should drive Christian to therapy. However, Strunsee, Finn, and Frankel did not respond to him. He determined that their decision to ignore him was part of a larger conspiracy directed at harming him. (Docket #2 at 6). Plaintiff continued to offer to drive Christian to therapy in lieu of his mother, but his offers were not taken.

In 2016, Finn asked psychologist Dolezal to conduct psychiatric testing on Plaintiff, Strunsee, and Christian. Plaintiff reluctantly complied with the request. However, when he attended his session with Dolezal, he felt that she was hostile and biased against him. He was offended by the suggestion that he struggled with substance abuse, anger, and narcissistic tendencies. Dolezal wanted to discuss Plaintiff's domestic violence

conviction, which Plaintiff thought was unnecessary. He maintains that the allegations giving rise to the conviction were merely a "pre-divorce strategy" used by Strunsee to "gain control and gain custody" of Christian. *Id.* at 7. He provided Dolezal with names of people who would vouch for his character. He claims that she never followed up with the names that he gave her, and her "actions to make sure certain contradictory evidence was never included in her report were direct conspiracy actions and RICO Enterprise" [sic]. *Id.*

In May or June of 2016, Strunsee filed a motion to re-open the custody placement proceedings. The next day, Dolezal's report came out, which recommended 100% custody with Strunsee. In light of this timing, Plaintiff believes that Dolezal improperly shared her findings with Strunsee before reporting them to the court, which was a "specific planned out implemented and deliberate conspiracy to create a way through the legal system to have [Plaintiff's] child removed from his custody and his home." *Id.* Nevertheless, it appears that Christian continued to stay with Plaintiff.

In October 2016, at Plaintiff's encouragement, Christian agreed to return to his mother's custody under the original shared custody schedule. Plaintiff wrote two lengthy emails to Finn, Strunsee, and Frankel apprising them of his productive talk with Christian, but did not hear back from any party. Plaintiff felt that he was helping Christian reunite with his mother, and was baffled at the lack of response. Around this time, Finn ordered a split custody arrangement that was similar to the prior arrangement. However, the first weekend that Christian was supposed to spend with Strunsee, they had an argument and Christian returned to his father's house. To Plaintiff's dismay, this fortified Finn's suspicion that Plaintiff was

manipulating Christian. Finn ordered full custody to Strunsee. Plaintiff requested an emergency custody hearing.

In November 2016, Judge Bohren reinstated shared custody. In December 2016, however, Judge Bohren made a final award of full legal and physical custody to Strunsee based on Dolezal's report and a letter that Frankel had written. Plaintiff believes that this placement was predicated on the "buzz-word" concept of "parental alienation," (i.e., when one parent tries to alienate a child from the other parent), and is therefore invalid. Plaintiff was ordered to complete a seven-step therapy program designed by Dolezal, which Plaintiff believed was entirely inappropriate.

There was an issue regarding which therapist Plaintiff would see to complete the seven-step program, which further antagonized Plaintiff. The Court recommended Chuck Adams ("Adams"), with whom Plaintiff was already acquainted. Finn suspected that Adams would not be impartial to Plaintiff, and requested that Judge Bohren use another therapist, Casey Holtz ("Holtz"). Plaintiff was very annoyed at this, and agreed to only see Holtz three times. The three sessions went well, however, and Plaintiff was left with the impression that shared custody would resume. Unfortunately, Finn determined that Plaintiff had not adequately completed the first step of Dolezal's plan, and would need to see a new therapist. Plaintiff interpreted this as another mechanism in the RICO Enterprise to delay progress, and became very upset. *Id.* at 11.

In July 2017, Plaintiff received an additional custody hearing, in which he subpoenaed his son to tell Judge Bohren that he wanted 50/50 custody. However, there were issues with service, and Christian never testified—nor was he even brought to court. Additionally, Holtz did not testify. Finn later told Judge Bohren that Holtz had requested to withdraw

from the case because Plaintiff had threatened him. Plaintiff hotly disputes that this occurred, and believes that Christian would corroborate his claim that the sessions with Holtz went well.

Judge Bohren chastised Plaintiff for his defiance and his refusal to follow Dolezal's seven-step plan, as well as for his actions towards Holtz. Judge Bohren did not credit anything that Plaintiff said in his defense. Instead, he suspended review of the case for an entire year, effectively issuing full custody to Strunsee.

Plaintiff was "very angry" and "very upset," and drafted an email to Finn and the other parties stating that he would not back down, and would come "after every one of them." *Id.* at 12. Then he "passed out from exhaustion and stress," only to awaken at two in the morning to an argumentative response from Finn. *Id.* Plaintiff fired off another missive in his defense, believing that Finn would "try to twist his comments around into something else in order to get him in trouble." *Id.* The next day, the Hartland Police Department called to interview Plaintiff about the emails. Plaintiff assuaged their concern that there was a threat of physical violence. Several hours later, three Waukesha sheriff deputies came to his house without a warrant and told him that he was in trouble for threatening a judge. Plaintiff asked them to leave. Three days later, an arrest warrant issued, and Plaintiff voluntarily turned himself in. He believed that there would be no consequences because he knew the relevant penal statute "like the back of his hand" and had not technically threatened any harm. *Id.* Nevertheless, Plaintiff struck a plea. Plaintiff believes that Finn reporting him to the police "conclusively proves" that the Defendants were trying to "use the law as a weapon to purposefully and intentionally harm him." *Id.* at 13.

Plaintiff moved the state court to recuse Finn, claiming that Finn had lied about the facts surrounding the therapy sessions with Holtz. Judge Bohren denied the motion. Plaintiff then asked Judge Bohren to recuse himself, because he was part of the RICO Enterprise to cause harm to Plaintiff. Judge Bohren denied this motion, as well. Then, Plaintiff gave the state court the contact information of five local psychologists who could conduct the first step of Dolezal's plan. However, Finn selected Jaffe, who had a logistically challenging schedule. Plaintiff believes this was more retaliation against him. Finn told Judge Bohren that Plaintiff had failed to contact Jaffe as instructed, notwithstanding phone records and emails that Plaintiff proffered documenting his contact attempts. Finn accused Plaintiff of lying. Judge Bohren denied another motion to recuse Finn.

In January 2018, Plaintiff met with Jaffe, who apparently informed Plaintiff that he "wanted to move this process along quickly. . .but was getting stalled and delayed by Strunsee." *Id.* at 14. Following this, however, Jaffe did not arrange to meet with Plaintiff and Christian until that summer. Some angry emails from Plaintiff's attorney followed, and Jaffe removed himself from the case "and refused to return despite very passionate and open letters" from Plaintiff. *Id.* at 15. Finn, too, became difficult to reach. It was never explained, to Plaintiff's satisfaction, how he had failed to complete the first step of Dolezal's seven-step plan.

Plaintiff claims that he had to pay $3,000.00/month to Finn, and believes that part of the delay in these proceedings was to ensure that these payments continued. *Id.* He also claims that the bill for all of the proceedings amounted to over $200,000.00. *Id.* at 16. These "grossly absurd and unjustified billings beyond reason" are part of the ostensible RICO Enterprise. *Id.* Plaintiff has not personally met with Finn in two years, and

does not believe that Finn meets with Christian very frequently, so he does not understand why Finn bills for so many hours of time. Plaintiff claims that the longer he "could be kept from his son, the more money the group could make." *Id.* at 17. The divorce and custody proceedings, he claims, amount to "legal-extortion" of his estate. *Id.*

Plaintiff forewent an appeal of the custody placement because Christian would soon turn eighteen. He has not appealed the GAL appointment, the fees imposed, the therapy requirement, or any other determination made by Judge Bohren.

3. **ANALYSIS**

    3.1 *Rooker-Feldman* **doctrine and domestic relations exception**

A plaintiff may not use the federal courts to collaterally attack the outcome of a state court proceeding in lieu of an appeal in the state court. *Rooker v. Fidelity Tr. Co.*, 263 U.S. 413, 415–16 (1923); *Dist. of Columbia Court of Appeals v. Feldman*, 460 U.S. 462, 482 (1983). Thus, "[u]nder the *Rooker-Feldman* doctrine, lower federal courts are precluded from exercising appellate jurisdiction over final state-court judgments." *Lance v. Dennis*, 546 U.S. 459, 463 (2006). The *Rooker-Feldman* doctrine's application most often occurs in "'cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments.'" *Id.* at 464 (quoting *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005)). The doctrine applies to claims that are "inextricably intertwined" with a state court's determination. *Remer v. Burlington Area Sch. Dist.*, 205 F.3d 990, 996 (7th Cir. 2000).

Somewhat relatedly, under the domestic relations exception to federal jurisdiction, state courts have exclusive jurisdiction over domestic

disputes. *Akenbrandt v. Richards*, 504 U.S. 689, 692–95 (1992) (reaffirming the rule that federal courts do not have jurisdiction over domestic disputes involving custody, divorce, or alimony); *Allen v. Allen*, 48 F.3d 259, 261 (7th Cir. 1998) (declining to hear a claim that was inextricably intertwined with a domestic dispute); *Struck v. Cook Cty. Pub. Guardian*, 508 F.3d 858, 859 (7th Cir. 2007) (finding that the domestic relations exception and the *Rooker-Feldman* doctrine barred a son's lawsuit challenging an appointment of a guardian for his mother).

Plaintiff's causes of actions are entirely predicated on challenging Judge Bohren's orders in the state divorce and custody suit.[1] Specifically, Plaintiff challenges the order denying recusal of Judge Bohren and Finn, the length and cost of the proceedings, the process of therapy designation, and the orders to award full custody to Strunsee based on various recommendations from Finn, Frankel, Dolezal, and Jaffe. Plaintiff also challenges the evidence upon which Judge Bohren relied in making his decisions, the propriety and confidentiality of the proceedings, and the validity of Bohren's conclusions, claiming that the totality of circumstances shows a plan to undermine Plaintiff's interests. In order to find in Plaintiff's favor, this Court would need to review the state court's decisions in the underlying divorce proceedings, which it cannot do. *Gerry v. Geils*, 82 F.3d 1362, 1369 (7th Cir. 1996) (declining jurisdiction of constitutional claims that would have called "for review of the state court's decision" in a closely related case).

---

[1]For these reasons, Plaintiff's motion to supplement pleadings and add Judge Bohren as a defendant are also futile. (Docket #55). Additionally, judicial immunity protects Judge Bohren from suit for any actions he engaged in while carrying out his duties. *Stump v. Sparkman*, 435 U.S. 349, 359 (1978); *Bradley v. Fisher*, 80 U.S. 335, 341 (1872).

Despite the dissatisfactory outcomes in the state proceedings, Plaintiff forewent an appeal in light of his son's looming eighteenth birthday, and instead chose to attack the outcomes at the federal level. This is inappropriate. If Plaintiff believes that the payments to Finn and the therapists were excessive or otherwise improper, then his recourse would be with a state court of appeals. Similarly, if Plaintiff believes that the custody determination was incorrect, that Finn was an inappropriate designee, that the proceedings were prejudicially long, or that the state court's reliance on any therapist's recommendations was improper, then his recourse would be with the state court of appeals. Plaintiff's longwinded attempt to cobble perceived injustices into a federal question is unavailing.

### 3.2  General failure to state a claim

Plaintiff has also failed to allege facts beyond the wildly speculative level that Defendants were engaged any wrongdoing. Without giving too much attention to a complaint over which the Court lacks jurisdiction, the Court quickly summarizes why the claims would have to be dismissed even if *Rooker-Feldman* did not apply.[2]

#### 3.2.1  Section 1983 Claims

Section 1983 imposes liability upon state actors who, under color of law, violate the constitutional rights of citizens. 42 U.S.C. § 1983. However, Section 1983 does not apply to the parties in question.

Attorneys serving as counsel in a given proceeding may not be sued under Section 1983. *Polk Cty. v. Dodson*, 454 U.S. 312, 325 (1981) (holding that "a public defender does not act under color of state law when performing a lawyer's traditional functions as counsel to a Defendant in a

---

[2] The parties agreed to dismiss the claims of child abuse. (Docket #42 at 12) (Docket #54 at 2).

criminal proceeding."). Therefore, Van Kirk and Sanders cannot be held liable under Section 1983 for their actions as counsel to Plaintiff during his divorce proceedings because they are not state actors.

Private mental health professionals who write reports and make recommendations for the court are also not state actors. *Shabazz v. Family Court of Delaware*, 2011 WL 3555852, at *3 (D. Del. 2011) (finding that private psychologists and volunteer child advocates are not "clothed with the authority of state law") (quoting *West v. Atkins*, 487 U.S. 42, 48 (1988)). However, even if they were, "court-appointed experts, including psychiatrists, are absolutely immune from liability for damages when they act at the court's direction." *Cooney v. Rossiter*, 583 F.3d 967, 970 (7th Cir. 2009). Therefore, Frankel, Dolezal, and Jaffe cannot be held liable under Section 1983.

Finally, Finn, as a court-appointed GAL, is absolutely immune from suit under Section 1983. *Id*. "[A]bsent absolute immunity, the specter of litigation would hang over a GAL's head, thereby inhibiting a GAL in performing duties essential to the welfare of the child whom the GAL represents." *Scheib v. Grant*, 22 F.3d 149, 157 (7th Cir. 1994) (citations omitted).

### 3.2.2 RICO Claims

18 U.S.C. § 1964(c), the Racketeer Influenced and Corrupt Organizations Act, creates a private right of action for "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter." In order to allege a violation of section 1962, a "plaintiff must allege (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Slaney v. Int'l Amateur Athletic Fed'n*, 244 F.3d 580, 597 (7th Cir. 2001). An enterprise is "a group of persons associated together for

a common purpose of engaging in a course of conduct." *United States v. Turkette*, 452 U.S. 576, 583 (1981). It may be shown "by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *Id.* A "pattern of racketeering activity" consists of "at least two [predicate] acts of racketeering activity within a ten-year period." *Corley v. Rosewood Care Ctr., Inc. of Peoria*, 142 F.3d 1041, 1048 (7th Cir. 1998). A predicate act is any indictable offense, though a conviction need not have occurred. *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 491 (1985).

Plaintiff has not alleged facts that, if true, show that the Defendants were part of an organization that was designed to inflict harm on him. The mere fact that his divorce and custody proceedings did not favor him is not circumstantial evidence of a RICO enterprise. He speculates that the timing of certain events suggests action in concert. For example, Strunsee moved to re-open custody proceedings the day before Dolezal issued her report recommending that Strunsee have full custody. However, there are no facts to support the notion that the timing was anything other than coincidental. Nor is it the case that Plaintiff alleged a series of coincidences so numerous as to be the result of orchestration.

Moreover, although Plaintiff alleges indictable offenses such as racketeering, theft, extortion, retaliation, and obstruction of justice, he has not pled any facts that, if true, demonstrate that Defendants committed these offenses. His specious allegations against Defendants are as follows: that his attorneys worked with Finn and Judge Bohren to secretly manipulate the therapists; that the therapists conspired against him to deprive him of custody of his child; that he is being forced to pay for therapeutic interventions that he does not need; that his attorneys

needlessly prolonged the divorce litigation to rack up fees; and that as a result of everyone's actions, his business suffered. Plaintiff has also alleged facts showing that the divorce and the custody disputes were drawn out and deeply contentious; that he engaged in angry correspondence with people that he felt made him look bad; that those people took a long time to respond to him; and that some of those people avoided working with him.

Taken together, these facts do not give rise to any indictable criminal offense. They simply illustrate how difficult the proceedings were, and how frustrated Plaintiff was (and continues to be). But a series of bad outcomes in a contentious divorce proceeding is not circumstantial evidence of a RICO conspiracy.[3]

## 4. CONCLUSION

Divorce and custody proceedings are notoriously highly emotional, frustrating, painful, and expensive. They are also the exclusive purview of the state court. If Plaintiff had any issue with the outcome of any aspect of the state court process, then his recourse was with the state court of appeals.

Accordingly,

**IT IS ORDERED** that Defendant Jennifer Van Kirk's motion to dismiss (Docket #8) be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that Defendant Mark Sanders' motion to dismiss (Docket #15) be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that Defendant Michael Finn's motion to dismiss (Docket #19) be and the same is hereby **GRANTED**;

---

[3]The Court would decline to exercise supplemental jurisdiction over the medical malpractice claims. 28 U.S.C. § 1367(c)(3).

**IT IS FURTHER ORDERED** that Defendant Michael Finn's motion to stay discovery pending resolution of the motion to dismiss (Docket #21) be and the same is hereby **DENIED as moot**;

**IT IS FURTHER ORDERED** that Defendants Sheryl Dolezal and Alan Jaffe's motion to dismiss (Docket #37) be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that Defendant Ephraim Frankel's motion to dismiss (Docket #50) be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that Plaintiff's motion for leave to supplement pleadings and to add a new defendant (Docket #55) be and the same is hereby **DENIED**; and

**IT IS FURTHER ORDERED** that this case be and the same is hereby **DISMISSED without prejudice**, except to the extent that Plaintiff alleges Section 1983 and RICO claims, which are **DISMISSED with prejudice**.

The Clerk of the Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 23rd day of July, 2019.

BY THE COURT:

_____
J.P. Stadtmueller
U.S. District Judge